## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ENTRUST ENERGY, INC. *et al.*[1] | Case No. 21-31070 (MI) |
| Post-Confirmation Debtors. | |
| ANNA PHILLIPS, as liquidating trustee of the ENTRUST LIQUIDATING TRUST, | Adv. Proc. No. 22-3018 (DRJ) |
| Plaintiff, | |
| v. | |
| ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC., | |
| Defendant. | |

## AMENDED COMPLAINT (I) OBJECTING TO ALLOWANCE OF CLAIM NOS. 107 AND 108 OF ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC. AND (II) REQUESTING OTHER RELIEF

**Claim No.:**  BMG Group Claim Nos. 107 and 108

**Claimant**:  Electric Reliability Council of Texas, Inc.

**Date Claims Filed:**  August 10, 2021

**Amounts of Claims as Filed:**  $296,940,248.94 (Claim No. 107); $1,453.01 (Claim No. 108)

**Status of Claims as Filed:**  General Unsecured Claims

---

[1]    The Debtors in these chapter 11 cases that are subject to the Plan and the Trust Agreement (each, as defined below) are: Entrust Energy, Inc.; Entrust Treasury Management Services, Inc.; Entrust Energy East, Inc.; Power of Texas Holdings, Inc.; Akyta Holdings, Inc.; Enserve, Inc.; Akyta, Inc.; Energistics, Inc.; NGAE, Inc. The Liquidating Trustee's mailing address is P.O. Box 500787, Atlanta, Georgia 31150.

No chapter 11 plan has been confirmed in the cases of the following Debtors:  Knocked, Corp.; SPH Investments, Inc.; Akyta IP, Inc.; Surge Direct Sales, Inc.; Entrust Energy Operations, Inc.; and Strategic Power Holdings, LLC.

Anna Phillips, solely in her capacity as Liquidating Trustee (the "Trustee") of the Entrust Liquidating Trust (the "Trust"), hereby files this amended adversary complaint (the "Amended Complaint") (i) objecting to the allowance of the above-described proofs of claims (the "ERCOT Claim") of Electric Reliability Council of Texas, Inc. ("ERCOT") and (ii) requesting other relief. In support of the Complaint, the Trustee alleges as follows:

## I.   NATURE OF THE ACTION

1.     This action arises out of repeated unlawful actions taken by ERCOT before and during Winter Storm Uri.  ERCOT knew months beforehand that an extreme weather event like Winter Storm Uri was highly likely to strike Texas during the winter of 2020–2021, but ERCOT failed to act reasonably to protect Texas residents and businesses.  When Winter Storm Uri then hit in February 2021, ERCOT breached its own Nodal Protocols ("Protocols") to rig electricity prices for the benefit of natural gas generators, and to the harm of everyone else.  ERCOT knew its actions were illegal and sought to cover itself by drafting an order to be rubber-stamped by its regulator, the Public Utility Commission of Texas ("PUCT").  The sloppily written order, however, failed to accomplish this goal, as the PUCT itself has since confirmed.  The result is that ERCOT miscalculated hundreds of millions of dollars of electricity purchased by the Debtors during Winter Storm Uri.

2.     The Trustee now brings this action to (1) disallow, in part, and materially reduce the ERCOT Claim in an amount as determined by this Court; (2) award the Trust all damages it proves at trial plus attorneys' fees, costs, and expenses, plus interest; (3) award the Trust pre- and post-judgment interest to the extent permitted by law; and (4) grant such other and further relief as the Court deems just, proper, and equitable.

## II.   JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider and determine this matter pursuant to 28

U.S.C. §§ 157 and 1334 and Article XII of the *Amended Joint Plan of Liquidation Under Chapter

11 of the Bankruptcy Code of Entrust Energy, Inc. and Its Debtor Affiliates* dated November 10,

2021 (as confirmed, the "Plan").

4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.      This Amended Complaint relates to the Entrust Energy, Inc., *et. al.* bankruptcy

cases, jointly administered under Case No. 21-31070, filed under title 11 of the United States Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas,

Houston Division (the "Chapter 11 Cases").  Venue is proper in this district and division pursuant

to 28 U.S.C. § 1409(a).

6.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Trustee consents to

entry of final orders or judgment by this Court in this adversary proceeding.

## III.   PARTIES

7.      The Trustee, as Plaintiff in this adversary proceeding, represents the interests of the

Trust, having been duly appointed in the Chapter 11 Cases pursuant to the Plan.  The Plan and

Confirmation Order provide for the establishment of the Trust according to the terms and

conditions of that certain *Liquidating Trust Agreement and Declaration of Trust* dated January 6,

2022 (the "Trust Agreement").  Pursuant to the Trust Agreement and the Plan, the Trustee has the

authority to object to claims and pursue claims against ERCOT on behalf of the Trust.

8.      ERCOT is a Texas membership-based 501(c)(4) nonprofit corporation governed by

a board of directors.  ERCOT has appeared in this Adversary Proceeding through its counsel of

record, Jamil Alibhai of Munsch Hardt Kopf & Harr, P.C. 500 N. Akard Street, Suite 3800 Dallas,

Texas 75201-6659.

# IV.   FACTUAL BACKGROUND

## A.   ERCOT And Its Regulation Of Texas's Electricity Market

9.     More than 26 million Texas customers receive their power from an electricity grid called the Texas Interconnection.  In the late 1990s, Texas enacted the Public Utilities Regulatory Act ("PURA"), which opened up this electricity market to competition.  PURA charged Texas's electricity regulator, the PUCT, with selecting an independent organization to act as the "independent system operator" ("ISO") of this newly deregulated market, subject to the PUCT's oversight.[2]  The PUCT selected ERCOT, an already-existing nonprofit corporation, to act as the ISO.

10.     ERCOT is required by PURA to "ensure the reliability and adequacy of the" Texas Interconnection.[3]  ERCOT (and the PUCT) are required to use "competitive rather than regulatory methods to achieve the goals of [PURA] to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[4]  PURA flatly prohibits ERCOT or the PUCT from "mak[ing] rules or issu[ing] orders regulating … prices … except as authorized" by statute.[5]

11.     The PUCT has the authority to adopt and enforce rules to accomplish the goals of PURA and to regulate the production and delivery of electricity.  The PUCT has delegated its rulemaking authority in part to ERCOT.  ERCOT has used this authority to create the Protocols.  The Protocols are comprehensive rules that govern all aspects of ERCOT's operations and are

---

[2]     TEX. UTIL. CODE § 39.151(b), (h).

[3]     *Id.* § 39.151(a)(2).

[4]     *Id.* § 39.001(d).

[5]     *Id.* § 39.001(c).

"created through the collaborative efforts of representatives of all segments of Market Participants."[6]

12.     One of ERCOT's responsibilities under the Protocols is to manage ERCOT's real-time electricity market.  Through this real-time market, ERCOT matches generation available in the Texas Interconnection to system load, meaning the "amount of energy in MWh delivered at any specified point or points on a system."[7]  ERCOT also determines pricing for electricity purchased in the real-time market, and acts as the "central counterparty" for these transactions— that is, "the sole buyer to each seller, and the sole seller to each buyer, of all energy [and] Ancillary Services…."[8]

13.     The centerpiece of ERCOT's pricing system is a program called Security Constrained Economic Dispatch ("SCED").  In basic terms, SCED integrates offers made by electricity generators with the real-time needs of the electricity system to calculate a locational marginal price ("LMP").  The LMP can be increased by price adders, which are defined by the Protocols.  The combination of the LMP and the price adders results in the actual price for electricity purchased on the real-time market, as shown in the figure below.[9]  As of February 2021, the PUCT had set the maximum price that could result from this process at $9,000/MWh, which it dubbed the high system-wide offer cap ("HCAP").[10]

---

[6]     Protocol 1.1(1).  All citations to the Protocols refer to the version in place as of February 1, 2021, available at:  https://www.ercot.com/files/docs/2021/08/18/February_1__2021_Nodal_Protocols.pdf.

[7]     Protocol 2.1, at 2-42.

[8]     Protocol 1.2(4).

[9]     *Brazos v. ERCOT*, Adv. Proc. No. 21-3863, Dkt. 407-5 at 69 (Bankr. S.D. Tex. Feb. 14, 2022).

[10]    16 TEX. ADMIN. CODE § 25.505(g)(6)(B) (2020 ed.).



14.    One of the price adders is called the Real-Time On-Line Reliability Deployment Price Adder ("Reliability Deployment Price Adder").  The Reliability Deployment Price Adder is an outgrowth of a scarcity pricing mechanism rule that the PUCT originally implemented in 2006. According to the Protocols, the Reliability Deployment Price Adder considers eight specific categories of reliability deployments ERCOT can implement during scarcity conditions.[11] Depending on whether those deployments are being implemented, the Reliability Deployment Price Adder can increase the price of electricity on the real-time market above the LMP.

15.    At the time of Winter Storm Uri, the categories used to calculate the Reliability Deployment Price Adder did not include firm load shed—meaning load that ERCOT orders to be taken offline, resulting in rolling blackouts.  This was not an oversight.  In fact, the original proposal to create the Reliability Deployment Price Adder included firm load shed, but ERCOT elected not to include it in the Reliability Deployment Price Adder that ERCOT adopted as part of

---

[11]    *See* Protocol 6.5.7.3.1(1).

the Protocols.  After Winter Storm Uri, ERCOT added firm load shed to the calculation of the

Reliability Deployment Price Adder through the standard Protocol revision procedures.[12]

**B.      The Debtors And The SFA**

16.      Debtor Entrust Energy, Inc. ("Entrust" and, together with its debtor affiliates, the

"Debtors") was formed in 2010.  Entrust was a retail energy company headquartered in Houston,

Texas that, for more than a decade, sold and delivered electricity and natural gas commodities to

residential and commercial customers in deregulated utility markets across the United States,

including Texas, Illinois, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

17.      With a focus on personalized customer service and straightforward pricing plans,

Entrust experienced significant growth from its inception and, at one point, was recognized as

Houston's fastest growing retail energy provider according to the Houston Business Journal.

18.      Entrust, like all companies that participated in the ERCOT market, executed a

Standard Form Market Participant Agreement ("SFA") with ERCOT.  Entrust and its affiliate

Power of Texas Holdings, Inc. ("Power of Texas") each executed an SFA with ERCOT, which

allowed each of them to act as a Load Servicing Entity ("LSE")—an entity that sells energy to

customers.  The SFAs of Entrust and Power of Texas are attached as **Exhibit A**.

19.      The SFA is a straightforward contract governed by Texas law.  The SFA provides

that the responsibilities and rights of the parties are governed by "the ERCOT Protocols, as

amended in accordance with the change procedure(s) described in the ERCOT Protocols, in effect

at the time of the performance or non-performance of an action."[13]   ERCOT specifically

---

[12]      *See* Nodal Protocol Revision Request 1081 (approved June 28, 2021), available at
https://www.ercot.com/mktrules/issues/NPRR1081.

[13]      SFA § 2(B).

represented and warranted that it "shall comply with, and be bound by, all ERCOT Protocols."[14] ERCOT also agreed that it would "use commercially reasonable efforts to mitigate any damages it may incur as a result of the other Party's performance or non-performance of" the SFA.[15]

## C.     ERCOT And The PUCT Respond To Winter Storm Uri With A Vague Order

20.     On Saturday, February 13, 2021, Winter Storm Uri, a historic blast of arctic weather producing abnormal subfreezing temperatures that lasted for multiple days, engulfed the state of Texas.  It was widely reported that this extreme weather event caused electric generation equipment and natural gas pipeline equipment to freeze or stop functioning, causing the available generation within the ERCOT market to dramatically decline.

21.     Although Winter Storm Uri was an extreme weather event, it was not the first of its kind in Texas.  In 2011, millions of Texans went days without power under ERCOT's watch after an onslaught of severe winter storms.  On August 16, 2011, the Federal Energy Regulatory Commission released a detailed report regarding the winter storms of 2011 that explained that a failure to winterize the grid was a contributing factor to the power outages around the state.[16]

22.     ERCOT had also predicted an event like Winter Storm Uri months before it hit Texas.  In November 2020, ERCOT's meteorologist reported that weather patterns strongly suggested a severe weather event would take place during the winter of 2020–2021.  But ERCOT did not take reasonable actions in response to that.  For instance, since 2011, ERCOT had visited

---

[14]     *Id.* § 6(A).

[15]     *Id.* § 8(D).

[16]     *See* OUTAGES AND CURTAILMENTS DURING THE SOUTHWEST COLD WEATHER EVENT OF FEBRUARY 1-5, 2011: CAUSES AND RECOMMENDATIONS, FED. ENERGY REG. COMM'N AND N. AM. ELECTRIC RELIABILITY CORP. (Aug. 2011), available at http://www.ferc.gov/sites/default/files/2020-04/08-16-11-report.pdf.

generation units and hosted seminars to advocate best practices for winter preparedness.  But upon information and belief, ERCOT did not ramp up these actions in the winter of 2020–2021, despite knowing that a severe weather event was very likely to occur.

23.     ERCOT issued its first notice concerning Winter Storm Uri late in the afternoon on Monday, February 8, 2021, when ERCOT issued an emergency "Operating Condition Notice"[17] report for "an extreme cold weather system approaching Thursday, February 11, 2021."  On Wednesday, February 10, 2021, ERCOT issued an "Advisory"[18] for the cold weather event for the ERCOT region."  And on Thursday, February 11, 2021, ERCOT issued a "Watch"[19] for an extreme cold weather event.  On February 12, 2021, Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas.

24.     On February 13 and 14, 2021, customer demand for electricity began to increase dramatically as Texans tried to keep their homes warm.  But at the same time, the freezing temperatures forced many generators offline just when they were needed most.

25.     At 12:15 a.m. on February 15, 2021, ERCOT declared a Level 1 Energy Emergency Alert ("EEA"), as available reserve generation dipped below 2,300 MWs.  Less than an hour later, ERCOT declared a Level 2 EEA.  At 1:20 a.m., ERCOT declared a Level 3 EEA ("EEA 3"), its highest alert level.  By this point, more than 35,000 MWs of generation capacity was offline—not

---

[17]     An "Operating Condition Notice" is the first of three levels of communication issued by ERCOT in anticipation of a possible emergency condition.  *See* Protocol 2.1, at 2-57; Protocol 6.5.9.3.1.

[18]     An "Advisory" is the second of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition.  *See* Protocol 2.1, at 2-2; Protocol 6.5.9.3.2.

[19]     A "Watch" is the third of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition.  *See* Protocol 2.1, at 2-99; Protocol 6.5.9.3.3.

for economic reasons, but because the cold temperatures prevented those generators from operating.

26.     When ERCOT entered EEA 3, it began ordering firm load shed of Texas residential customers.  By mid-day on February 15, ERCOT had ordered firm load shed of more than 15,000 MWs, leaving thousands of Texans with no way to heat their homes.

27.     Despite the fact that ERCOT was operating at EEA 3, ERCOT's pricing systems were working according to plan.  The SCED system and price adders continued to function as intended during Winter Storm Uri, resulting in electricity costs that complied with ERCOT's Protocols.  These prices were much higher than normal, and sometimes approached the $9,000/MWh HCAP.  But for much of the day on February 14, and even on February 15 after ERCOT directed firm load shed, electricity cleared for less than $2,000/MWh.

28.     ERCOT's CEO, William Magness ("Magness"), wanted those prices to be higher. Magness has testified that during Winter Storm Uri, he was contacted by executives of electricity generators, who complained about the high price of natural gas.  Those generators could have responded to these increased prices easily by adjusting the offers they submitted to the SCED system.  ERCOT also knew that higher electricity prices would not bring any generating capacity online because every generator that could operate was already doing so.  But Magness nonetheless believed that electricity prices should be pegged to their maximum level to reflect the extreme market conditions.

29.     Magness recognized that ERCOT did not have the legal authority to peg prices at the HCAP level under the existing Protocols.  But instead of abandoning his desire for higher prices and allowing the SCED system and price adders to function as intended, Magness decided to ask the PUCT to issue an order that would give ERCOT legal cover to rig prices.  ERCOT

hastily drafted an order for the PUCT to rubber stamp.  The PUCT staff made a few changes, and at 4:58 p.m. on February 15, presented the final product (pre-signed) for the commissioners' approval.  At 5:20 p.m., the three PUCT commissioners met for six minutes and approved the ERCOT-drafted order (the "February 15 PUCT Order").[20]

30.     Magness may have intended for ERCOT to get clear legal cover to peg prices at the HCAP level, but the actual language of the February 15 PUCT Order failed to accomplish that goal.  The February 15 PUCT Order did not direct ERCOT to set prices at $9,000/MWh, nor did it instruct ERCOT to make any specific change to its Protocols.  Instead, the February 15 PUCT Order vaguely "directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[21]

31.     The PUCT has since confirmed in court filings that the February 15 PUCT Order "provided no further instructions to ERCOT about what adjustments should be made or how ERCOT should make them."[22]  The February 15 PUCT Order also did not "make self-executing statements applicable to market participants that 'electricity will be automatically priced at the $9,000 system-wide offer cap.'"[23]  In other words, the PUCT has conclusively stated that the February 15 PUCT Order did not give ERCOT self-executing authority to set prices at the HCAP level, nor did it give ERCOT unambiguous direction to make any specific changes to its Protocols.

---

[20]     Order Directing ERCOT To Take Action and Granting Exception to Commission Rules, PUC Project No. 51617, PUCT (Feb. 15, 2021), available at https://www.ercot.com/files/docs/2021/02/16/51617WinterERCOTOrder.pdf.

[21]     *Id.* at 2.

[22]     Brief for Appellee at 9, *Luminant Energy Co. LLC v. PUCT*, No. 03-21-00098-CV (Tex. App., 3d Dist. Sept. 2, 2021), available at https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=751805eb-cf95-4b62-aa91-106fdaff35e7&coa=coa03&DT=Brief&MediaID=9e3a8b12-255b-4cf0-bda7-781722ffe82b.

[23]     *Id.* at 24.

32.     The PUCT's vague order also included nonsensical purported findings.   The February 15 PUCT Order states that "[a]t various times today, energy prices across the system have been as low as approximately $1,200," which the PUCT believed was "inconsistent with the fundamental design of the ERCOT market."[24]  The commissioners also opined that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."[25]  These supposed findings of fact overlooked that ERCOT expressly decided not to include firm load shed in its calculation of the Reliability Deployment Price Adder.  They also overlooked the fact that all available generating supply was already operating—no generators were sitting on the sideline waiting for prices to increase.

**D.     ERCOT Responds To The February 15 PUCT Order By Breaching The Protocols**

33.     Once ERCOT received the February 15 PUCT Order, it had to decide how to implement it.  ERCOT decided that the best response was to effectively change the Protocols, and specifically the definition and calculation of the Reliability Deployment Price Adder.

34.     The Protocols contain clear procedures for proposing and adopting revisions.  For time-sensitive changes, ERCOT can direct its staff to file a revision request, which can then be considered and approved on an urgent timeline.[26]

35.     Instead of complying with the Protocols' revision procedures, ERCOT decided to breach them.  Without going through the revision process, and without express direction from the February 15 PUCT Order, ERCOT chose to take one element of the Reliability Deployment Price Adder that was not being used during EEA 3 and change it into a surrogate for the cumulative

---

[24]     February 15 PUCT Order at 1.

[25]     *Id.*

[26]     *See* Protocol 21.5.

12

amount of firm load shed.  This unauthorized change was not permitted by the February 15 PUCT Order or the Protocols.  And implementing this unauthorized change in customer invoices violated the SFA, which required that the version of the Protocols in effect at the relevant time would govern ERCOT's actions.

36.     ERCOT's unlawful change to the Reliability Deployment Price Adder immediately caused prices to spike to the HCAP level of $9,000/MWh.  At 11:08 p.m. on February 15, ERCOT issued a market notice announcing that it had "already [] implemented" this change to the Reliability Deployment Price Adder, and that this change "will operate prospectively until the Commission directs otherwise."[27]

37.     On February 16, 2021, the PUCT briefly reconvened to approve another order, which reiterated the substance of the February 15 PUCT Order, but struck a portion that made that Order retroactive.[28]  These two Orders are collectively referred to as the "February PUCT Orders."

38.     ERCOT's unauthorized change to the Reliability Deployment Price Adder was already a departure from the plain language of the February PUCT Orders, but on February 17, 2021, ERCOT went further still.  Shortly after midnight on February 17, firm load shed dropped below 15,000 MWs for the first time since February 15.  As firm load shed continued to drop on February 17, ERCOT personnel began to worry that their unauthorized change to the Reliability Deployment Price Adder would no longer keep prices at the HCAP level.  ERCOT decided that this result was unacceptable.  So, at 8:50 p.m. on February 17, ERCOT changed the Reliability

---

[27]     ERCOT Market Notice M-C021521-01 (Feb. 15, 2021), available at https://www.ercot.com/services/comm/mkt_notices/detail?id=bbd04677-bc71-3a8f-9d99-5715e3484f5e.

[28]     Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules, PUC Project No. 51617, PUCT (Feb. 16, 2021), available at https://www.puc.texas.gov/51617WinterERCOTOrder.pdf.

Deployment Price Adder again to include a static value of 20,000 MWs of firm load shed—more than double the firm load shed that was in effect at that time.  Thirty minutes later, ERCOT issued another market notice to announce this change.  The notice also advised the market that "[o]nce ERCOT is no longer instructing firm Load shed, the adjustment [to the Reliability Deployment Price Adder] will be set to 0, as it would be in the previous implementation."[29]

39.    ERCOT's statement turned out to be false.  Firm load shed dropped to 0 MW at 11:55 p.m. on February 17, 2021.  But ERCOT continued to misuse the Reliability Deployment Price Adder to peg prices at $9,000/MWh until 9:00 a.m. on February 19, 2021.[30]  Thus, ERCOT left the HCAP in place for 33 hours after firm load shed had stopped, in breach of the Protocols, the February PUCT Orders, and ERCOT's own February 17 market notice.

40.    ERCOT's unlawful decision has been criticized by the PUCT's Independent Market Monitor ("IMM"), the person charged with monitoring ERCOT's activities so as to "[d]etect and prevent market manipulation strategies and market power abuses."[31]  The IMM called ERCOT's actions during the 33 hours an "inappropriate pricing intervention" that "resulted in $16 billion in additional costs to ERCOT's market."[32]

41.    The IMM also criticized ERCOT's calculation of charges for ancillary services.  Ancillary services are capacity that ERCOT purchases and reserves to allow ERCOT to respond

---

[29]    ERCOT Market Notice M-C021521-03 (Feb. 17, 2021), available at https://www.ercot.com/services/comm/mkt_notices/detail?id=9e59e0d5-abb0-3f8d-aa5a-2e1d358a362f.

[30]    *See* ERCOT Market Notice M-C021521-05 (Feb. 19, 2021), available at https://www.ercot.com/services/comm/mkt_notices/detail?id=dba778b5-e00b-30c6-ba2e-16784af65c2d.

[31]    16 TEX. ADMIN. CODE § 25.365(c)(1).

[32]    *Brazos*, Dkt. 408-39 at 2-3.

to quickly changing conditions in the ERCOT market.  During Winter Storm Uri, ERCOT purchased ancillary services for prices that were much higher than the value of lost load—a price that is capped by statute at $9,000/MWh.  The IMM has concluded that "[n]either ERCOT's protocols nor any Commission Order endorses pricing shortages of operating reserves higher than shortages of energy."[33]  In other words, ERCOT unlawfully breached its Protocols when it passed along these improperly high costs to market participants.

42.     In addition, a study conducted by London Economics International ("LEI") found that, in the absence of ERCOT's unlawful changes to the Reliability Deployment Price Adder, prices during the period from February 15, 2021 at 10:15 p.m. to February 19, 2021 at 9:00 a.m. would have been $2,404/MWh on average—an amount that is $6,578/MWh lower than the real-time settlement point prices established by ERCOT.[34]  In addition, the report states that it was a "straightforward matter" for LEI to unwind the transactions and revert back to real-time energy prices pursuant to the Protocols.[35]  This suggests that it would have been a straightforward matter for ERCOT to recalculate prices in accordance with the Protocols in force during Winter Storm Uri, rather than ERCOT's unlawful changes.

E.     **ERCOT Takes The Debtors' Property Without Compensation Through The Mass Transition**

43.     Heading into February 2021, the Debtors remained in compliance with all financial metrics based on agreements with Shell Energy North America (US), L.P. and related entities

---

[33]     *Id.* at 6.

[34]     *See* LONDON ECONOMICS INTERNATIONAL, ANALYSIS OF ERCOT MARKET PRICES DURING FEBRUARY 2021 WINTER STORM EVENT at 4 (May 28, 2021), available at https://interchange.puc.texas.gov/Documents/51617_10_1131376.PDF.

[35]     *Id.*

(collectively, "Shell").  But one day into Winter Storm Uri, Shell breached its agreements with the Debtors by serving a purported notice of termination.  After receiving this purported termination notice, the Debtors immediately sought to expedite the sale of their remaining customers to other retail energy providers ("REPs") in order to maximize value to creditors and limit the number of customers that would be transitioned to a provider of last resort ("POLR").

44.     The POLR program was created by the Texas Legislature, which has exercised its police power to mandate that all Texas customers are "entitled … to be served by a provider of last resort that offers a [PUCT]-approved standard service package."[36]   The Legislature has required that "[i]n the event that a retail electric provider fails to serve any or all of its customers, the [POLR] shall offer that customer the standard retail service package for that customer class with no interruption of service to any customer."[37]  Befitting the importance of the POLR program, the Legislature has given the PUCT the right to "require a retail electric provider to become the" POLR if necessary to serve an area.[38]

45.     The PUCT implemented the Legislature's direction by enacting a POLR regulation as part of the PUCT's "customer service and protection rules."[39]   The POLR rule aims to ensure that retail customers receive service in the event the customer's REP "fail[s] to meet its obligations to" ERCOT.[40]   The detailed rule also contains provisions governing a "[m]ass transition of customers to POLR providers."[41]  Confirming the public importance of the POLR program, the

---

[36]     TEX. UTIL. CODE § 39.101(b)(4).

[37]     *Id.* § 39.106(g).

[38]     *Id.* § 39.106(f).

[39]     16 TEX. ADMIN. CODE § 25.21.

[40]     *Id.* § 25.43(a).

[41]     *Id.* § 25.43(*l*).

PUCT rule grants ERCOT state-law immunity "for transitioning or attempting to transition a customer from such REP to the POLR provider to carry out" the rule.[42]

46.     Several ERCOT Protocols also address the POLR program and mass transitions. One portion of the Protocols, which is within a larger section titled "ERCOT's Remedies," gives ERCOT the right to terminate a market participant's contracts with ERCOT, or revoke that entity's right to participate in the ERCOT market, if that participant breaches its payment obligations.[43] Pursuant to the Legislature's instructions for customers to be served by a POLR if their REP cannot do so, the Protocol also notes that "[i]f a breaching Market Participant is also an LSE," then "ERCOT shall initiate a Mass Transition" once the market participant's agreements with ERCOT or right to participate in the ERCOT market are terminated.[44]   ERCOT must perform a mass transition "whether or not the Default occurred pursuant to the Market Participant's activities as an LSE."[45]   The LSE does not receive any credit for the value of the customers transferred to a POLR via a mass transition.[46]

47.     As a result of the Debtors' efforts to maximize value for their creditors, the Debtors negotiated, and on March 10, 2021, closed on, a sale to Rhythm Ops, LLC ("Rhythm") of

---

[42]     *Id.* § 25.43(o)(2).

[43]     Protocol 16.11.6.1.6(1).

[44]     Protocol 16.11.6.1.6(3)(b).

[45]     Protocol 16.11.6.1.6(3).

[46]     *See* Protocol 16.11.6.1.6(4) ("After revocation of its rights or termination of its Agreement with ERCOT, the Market Participant will remain liable for *all* charges or costs associated with any continued activity related to the Counter-Party's relationship with ERCOT and any expenses arising from the consequences of such termination or revocation.") (emphasis added).

approximately 91,000 commercial and residential customer equivalents ("RCEs") and other assets for $3.160 million.

48.     The Rhythm transaction left the Debtors with contracts with approximately 13,000 customers (or approximately 90,000 RCEs).  The Debtors worked diligently to find a purchaser for those remaining customer relationships.

49.     On March 3, 2021, the Debtors received a letter of intent from JP Energy Resources, LLC ("JP Energy") to purchase a significant portion of the Debtors' remaining customer relationships.  Within hours after receiving this letter of intent, the Debtors notified ERCOT and requested one week to close the sale.  A client services representative from ERCOT indicated that a week may be too long, but that they would follow up with the appropriate decision maker.  The next communication the Debtors received from ERCOT was later that same day informing the Debtors that they were in material breach of the SFA and that ERCOT planned to immediately transition the Debtors' existing Texas customers to the POLR program.

50.     Further requests by the Debtors for ERCOT to reconsider its decision were dismissed, which effectively terminated the Debtors' ability to consummate a sale under the JP Energy letter of intent.  Upon information and belief, ERCOT completed the transition of the Debtors' remaining Texas customers to the POLR program shortly thereafter (the "Mass Transition").

51.     ERCOT did not provide any compensation for the customer contracts it took from the Debtors through the Mass Transition.  Nonetheless, these customer contracts plainly had substantial value, as shown by the sale of other RCEs to Rhythm and the letter of intent from JP Energy.

G.      **The ERCOT Claim And Debt Obligation Order**

52.      On March 30, 2021 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.

53.      On August 10, 2021, ERCOT filed the ERCOT Claim, Claim Nos. 107 against

Entrust, in the amount of $296,940,248.94, and 108 against Power of Texas, in the amount of

$1,453.01.  The ERCOT Claim is based on the Debtors' alleged breach of the SFA.  The ERCOT

Claim makes ERCOT the Debtors' largest unsecured creditor, by far.  As a result, the Trustee will

be unable to make significant payments to other unsecured creditors until the value of the ERCOT

Claim is determined by the Court.

54.      Although ERCOT alleges that Debtors have underpaid for the electricity they

purchased during Winter Storm Uri, the generators of that electricity have already been made

whole through a "Debt Obligation Order" entered by the PUCT on October 14, 2021.[47]  According

to ERCOT itself, the debt securitization resulting from the Debt Obligation Order "closed and

proceeds were distributed to Market Participants in November 2021.  Thus, all Market Participants

that were short paid under Protocol Section 9.19.(1)(d) as a result of Entrust's [alleged] failure to

pay ERCOT have since been paid those amounts from the securitization proceeds."[48]  As a result

of the Debt Obligation Order, the financial obligations of remaining market participants cannot

increase regardless of the result of this Adversary Proceeding.[49]

---

[47]      Docket No. 52321, PUCT (Oct. 14, 2021), available at https://interchange.puc.texas.gov/
Documents/52321_214_1159471.PDF.

[48]      ERCOT's Response in Opposition to Luminant Energy Company LLC's Motion for
Limited Permissive Intervention at 10-11, Dkt. 27 (footnote omitted).

[49]      *See id.* at 2 ("[T]here will be no need to issue Default Uplift Invoices.  Market participants
that were previously short paid due to Entrust's [alleged] default have been paid with

## V.   CLAIMS FOR RELIEF[50]

### COUNT I
**(Objection to the ERCOT Claim under Bankruptcy Code Section 502(b)(1):**
**Excessive Charges by ERCOT that Conflict with the SFA)**

55.    The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

56.    The Trustee seeks to reduce the ERCOT Claim because, for the reasons set forth herein, the ERCOT Claim as filed is unenforceable against the Debtors and property of the Debtors under the SFA and the Protocols.

57.    Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest … objects."  If an objection to a proof of claim is made, "the court … shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that … such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law other than because such claim is contingent or unmatured," among other reasons that are not applicable here.[51]

---

[50]    securitization proceeds—alleviating any hypothetical future need to issue Default Uplift Invoices.").

[50]    The Court has dismissed with prejudice Counts VII, VIII, IX, and X of the Trustee's original Complaint (Dkt. 1).  The Trustee does not replead those Counts in this Amended Complaint, but reserves the right to appeal the Court's dismissal of them.  *See Williams v. Wynne*, 533 F.3d 360, 365 (5th Cir. 2008).  The Trustee has also withdrawn Count III of its original Complaint without prejudice, in reliance on ERCOT's representation to the Court that "ERCOT's claims do not seek Capital 'D' Default damages."  ERCOT's Motion to Dismiss and for Abstention or Stay at 31, Dkt. 10.  Should ERCOT's position change, the Trustee will seek to reassert that count.

[51]    11 U.S.C. § 502(b)(l).

58.     Accordingly, under Bankruptcy Code section 502(b), the Trustee requests that the Court determine the amount of the ERCOT Claim in lawful currency of the United States as of the Petition Date.

59.     Under the SFA, ERCOT specifically represented and warranted that it "shall comply with, and be bound by, all ERCOT Protocols"[52]  The SFA further provides that "[f]or the purposes of determining responsibilities and rights at a given time, the ERCOT Protocols, as amended in accordance with the change procedure(s) described in the ERCOT Protocols, in effect at the time of the performance or non-performance of an action, shall govern with respect to that action."[53]

60.     At the time of Winter Storm Uri, the Protocols did not authorize ERCOT to account for firm load shed as part of its scarcity pricing signals.  But on February 15, 2021, ERCOT unlawfully changed its calculation of the Reliability Deployment Price Adder to include firm load shed.  ERCOT's unlawful change was not mandated by the February PUCT Orders, as the PUCT itself has since confirmed.  Nor did ERCOT comply with the procedures for making urgent changes to the Protocols.

61.     Even if the February PUCT Orders authorized ERCOT to make its unlawful change to the calculation of the Reliability Deployment Price Adder (and it did not), ERCOT acted unlawfully when, beginning at 8:50 p.m. on February 17, 2021, ERCOT changed the Reliability Deployment Price Adder again to include a static value of 20,000 MWs of firm load shed.  This value was much more than the amount of firm load shed ERCOT had ordered at the time.

---

[52]     SFA § 6(A).

[53]     *Id.* § 2(B).

62.     ERCOT continued calculating the Reliability Deployment Price Adder using a static 20,000 MWs of supposed firm load shed even after firm load shed ended at 11:55 p.m. on February 17, 2021.  ERCOT kept this improper practice in place for 33 hours—until 9:00 a.m. on February 19, 2021.

63.     For these reasons, the purported value of the ERCOT Claim is based on an erroneous calculation performed by ERCOT.  The cost of electricity and ancillary services must be calculated pursuant to the Protocols in effect during Winter Storm Uri, which did not permit any of these actions by ERCOT.

64.     Furthermore, in response to Winter Storm Uri, the Texas Legislature enacted Senate Bill 1580, which caps market participants' payment obligations during the storm to the "amounts owed calculated solely according to the protocols in effect during the period of emergency."[54]

65.     The Trustee thus seeks an order under Bankruptcy Code Section 502(b)(1) disallowing the ERCOT Claim to the extent that the asserted amount exceeds the amount properly calculated under the SFA and the Protocols in effect during Winter Storm Uri.

**COUNT II**
**(Objection to the ERCOT Claim under Bankruptcy Code Section 502(b)(1):**
**ERCOT's Failure to Mitigate)**

66.     The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

67.     Texas law requires a party to a contract to mitigate damages caused by its breach. Section 8(D) of the SFA also provides that each party must "use commercially reasonable efforts

---

[54]     S.B. 1580, § 3, 2021 Leg. Sess. 87(R) (Tex. 2021) (codified at TEX. UTIL. CODE § 39.160).

to mitigate any damages it may incur as a result of the other Party's performance or non-performance."

68.     ERCOT breached the SFA and Protocols on February 15, 2021, when it unlawfully changed the Reliability Deployment Price Adder to include firm load shed.  ERCOT breached the SFA and Protocols again on February 17, 2021, when it unlawfully used a static value of 20,000 MWs to represent firm load shed, even though firm load shed was much less than that amount, and indeed, after firm load shed ended.  ERCOT's breaches continued through 9:00 a.m. on February 19, 2021, when ERCOT finally resumed calculating the Reliability Deployment Price Adder in accordance with its Protocols.

69.     ERCOT failed to mitigate the damages to the Debtors caused by these breaches of the SFA and Protocols.

70.     The Trustee thus seeks an order under Bankruptcy Code Section 502(b)(1) disallowing the ERCOT Claim to the extent that the asserted amount includes ERCOT's unmitigated damages.

### COUNT III
**(Objection to the ERCOT Claim under Bankruptcy Code Section 502(b)(1) and Action to Avoid Constructively Fraudulent Obligation Under Bankruptcy Code Section 548)**

71.     The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

72.     Under Bankruptcy Code Section 548(a), a debtor may avoid any obligation incurred by the debtor on or within two years prior to the Petition Date if the debtor received less than a reasonably equivalent value in exchange for such obligation and (i) the debtor was insolvent on the date that such obligation was incurred, or became insolvent as a result of such obligation; (ii) the debtor was engaged in business or a transaction, or was about to engage in business or a

transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

73.     The ERCOT Claim is based on a miscalculation by ERCOT, as ERCOT unlawfully changed the Reliability Deployment Price Adder to include firm load shed and continued to do so even after firm load shed ended on February 17, 2021.

74.     These miscalculated changes are an "obligation" imposed by ERCOT within two years before the Petition Date.

75.     The Debtors received less than a reasonably equivalent value in exchange for such obligation, as the reasonably equivalent value was required to be set according to the Protocols in effect at the time of Winter Storm Uri, which did not account for firm load shed.

76.     The Debtors became insolvent as a result of such obligation, were left with an unreasonably small capital with which to engage in business or a transaction, or believed that incurrence of such obligation would be beyond the Debtors' ability to pay debts as such debts matured.

77.     Accordingly, the obligation is avoidable pursuant to Bankruptcy Code Section 548(a) to the extent that such obligation exceeds the reasonably equivalent value of what the Debtors received.

**COUNT IV**
**(Objection to the ERCOT Claim under Bankruptcy Code Section 502(b)(1) and Action to Avoid Constructively Fraudulent Obligation Under TEX. BUS. & COM. CODE § 24.005)**

78.     The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

79.     Under TEX. BUS. & COM. CODE § 24.005, an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time

after the obligation was incurred, if, within four years after the obligation was incurred, the debtor

incurred the obligation (1) without receiving a reasonably equivalent value in exchange for the

obligation and (2) the debtor was engaged or was about to engage in a business or a transaction for

which the remaining assets of the debtor were unreasonably small in relation to the business or

transaction, or the debtor intended to incur, or believed or reasonably should have believed that

the debtor would incur, debts beyond the debtor's ability to pay as they became due.  Similarly,

under Tex. Bus. & Com. Code § 24.006, an obligation incurred by a debtor is fraudulent as to a

creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor

made the transfer or incurred the obligation without receiving a reasonably equivalent value in

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor

became insolvent as a result of the transfer or obligation.

80.     The ERCOT Claim is an obligation that arose within four years prior to the Petition

Date for power sold at the unreasonable and excessive $9,000/MWh price.  The Debtors received

less than reasonably equivalent value in exchange for such obligation.  The Debtors either were

engaged or were about to engage in a business or a transaction for which the remaining assets of

the Debtors were unreasonably small in relation to the business or transaction, or the Debtors

intended to incur, or believed or reasonably should have believed that the Debtors would incur,

debts beyond the Debtors' ability to pay as they became due.  And the Debtors became insolvent

as a result of the transfer.

81.     The Trustee has standing to avoid the ERCOT Claim pursuant to TEX. BUS. & COM.

CODE § 24.008(a).  More than 80 unsecured creditors have asserted claims against the Debtors,

and one or more of these creditors would have standing to assert this claim.  The Trustee brings

this claim stepping into the shoes of such creditors.

82.     Accordingly, the ERCOT Claim is a voidable fraudulent obligation under TEX. BUS. & COM. CODE §§ 24.005, 24.006(a), and 24.008(a) to the extent that such obligation exceeds the reasonably equivalent value in exchange for what the Debtors received.

**COUNT V**
**(Violation of Takings Clause under the Fifth Amendment**
**of the United States Constitution in Violation of 42 U.S.C. § 1983)**

83.     The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

84.     The Takings Clause of the Fifth Amendment of the U.S. Constitution states that "private property [shall not] be taken for public use, without just compensation."  U.S. CONST. amend. V.

85.     The Debtors had a vested property interest in their contracts with their remaining RCEs after the sale of approximately 91,000 RCEs to Rhythm for $3.160 million.

86.     ERCOT took this property interest of the Debtors by performing the Mass Transition.  ERCOT did not pay the Debtors any compensation for this taking.

87.     ERCOT was acting in a sovereign capacity, and under color of state law, when it effected the Mass Transition.  ERCOT was acting pursuant to PURA, a statute enacted by the Texas Legislature, and pursuant to regulations enacted by the PUCT, which granted ERCOT state-law immunity for performing the Mass Transition.  ERCOT was not exercising a contractual remedy by performing the Mass Transition, as the Debtors received no credit from ERCOT for the value of their customer contracts.

88.     Accordingly, Plaintiff is entitled to just compensation for the value of property taken by ERCOT through the Mass Transition.  Plaintiff is also entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT VI
### (Gross Negligence)

89.     The Trustee repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

90.     ERCOT has a statutory, regulatory, and common law duty to "ensure the reliability and adequacy of the" Texas Interconnection.[55] ERCOT also had a duty to take reasonable care in estimating and planning for the amount of generation capacity and load that would result from Winter Storm Uri.

91.     Before Winter Storm Uri hit, ERCOT knew of the extreme degree of risk that a weather event such as Winter Storm Uri would cause to the Texas Interconnection and Texas customers.  ERCOT knew that much of the Texas Interconnection's generation and transmission capacity was inadequately prepared for extreme winter weather.  ERCOT also knew that Texas customers depend on electric power to generate heat.  As such, ERCOT knew that a weather event such as Winter Storm Uri could cause low generation supply and extremely high demand, and thus cause rolling blackouts, loss of heat, and an extreme degree of risk to the health and safety of Texans.

92.     ERCOT predicted as early as November 2020 that an extreme weather event such as Winter Storm Uri was highly likely during the winter of 2020–2021.  ERCOT had steps it could have and should have taken based on this subjective knowledge.  For instance, ERCOT could have increased its visits to generating facilities to ensure they were adequately winterized and could have increased its educational efforts to ensure that generators were prepared for the winter weather event ERCOT knew was coming.  But ERCOT failed to take these and other steps, in

---

[55]     TEX. UTIL. CODE § 39.151(a)(2); 16 TEX. ADMIN. CODE § 25.361(b).

conscious indifference to the safety and welfare of the Texas residents and business whose livelihoods depended on a reliable and adequate Texas Interconnection.  ERCOT also knew that its inaction would likely result in serious injury to the Debtors, who acted as LSEs within the ERCOT marketplace.

93.     Once Winter Storm Uri hit, ERCOT continued to act with conscious indifference to the rights, safety, and welfare of others, including Debtors.  For instance, ERCOT failed to inform the market that ERCOT was making unauthorized changes to the Reliability Deployment Price Adder until after those changes were implemented.  ERCOT then failed to comply with its own notice to the market by refusing to reduce the amount of firm load shed it improperly included in the Reliability Deployment Price Adder to match the amount of firm load shed that was actually in place in the system.

94.     Upon information and belief, these malicious actions were taken by ERCOT's CEO, William Magness.  The identity of all actors responsible for this malicious conduct is exclusively within the knowledge and control of ERCOT—not the Trustee.  ERCOT authorized the malicious conduct of these agents, and then ratified their malicious conduct.

95.     Accordingly, Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial.

## VI.    REQUEST FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in its favor as follows:

a)     Disallowing, in part, and reducing the ERCOT Claim by an amount to be determined by the Court;

b)      Award the Trust all damages it proves at trial plus attorneys' fees, costs, and expenses;

c)      Award the Trust pre- and post-judgment interest to the maximum extent permitted by law; and

d)      For such other and further relief as the Court deems just, proper, and equitable.

Dated: June 24, 2022                                      **MCDERMOTT WILL & EMERY LLP**

*/s/ Charles R. Gibbs*
Charles R. Gibbs (TX Bar No. 7846300)
Debbie E. Green (TX Bar No. 24059852)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
crgibbs@mwe.com
dgreen@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Guyon H. Knight (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
dazman@mwe.com
gknight@mwe.com

***Counsel to Anna Phillips, as liquidating trustee of the Entrust Liquidating Trust***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2022, I caused a true and correct copy of the foregoing *Amended Complaint (I) Objecting to Allowance of Claim Nos. 107 and 108 of Electric Reliability Council of Texas, Inc. and (II) Requesting Other Relief* to be served via ECF on all parties to this adversary proceeding and all other parties requesting notice therein.


          */s/ Debbie E. Green*
          Debbie E. Green